Good morning, Your Honors. Good morning. My name is Nina Rabin, and I'm appearing on behalf of Petitioners Guillermina Ibarra and her three minor children. I'd like to reserve two of my ten minutes for rebuttal. All right. Please know that the time showing is your total time remaining. Okay. Thank you. Your Honors, this case is not about two competing understandings of the same set of facts. Rather, it's about a decision by the Board of Immigration Appeals that wholly fails to engage with or even discuss key probative evidence in the record in coming to its conclusions. So I'd argue that you're only required to delve into the large and complex evidentiary record to the extent it demonstrates that the board decision fails to accurately describe, let alone contend with, very powerful and disturbing key facts in the record. In the recent decision issued by this court in Perata v. Sessions, the court stated that the standard of review of Board of Immigration Appeals' factual determinations is deferential, but deference does not mean blindness. And here I would say that it takes a form of blindness or perhaps more specifically severe myopia to come to the conclusions the board did based on this evidentiary record. So, counsel, why wasn't it fair for the board to conclude that this was a family feud as opposed to typical persecution that we see in the cases? Well, in fact, Your Honor, I think that the problem is the court, the board refused to acknowledge it was a family feud, because if it was a family feud, then this is clearly persecution on the base of family membership. I think that there's no question that the events that, the incidents that befell Ms. Ibarra's family members, particularly the torture of her brother, rises to the level of persecution. But the board discounted that and found that she hadn't suffered past persecution because it said that family wasn't one of the motives of her, of his persecutors. If it were for personal reasons, for instance, if the father thought that the bride was too young to be with the claimant's brother, would that be a ground of persecution in your view? Right. So as long as family is one central reason, it could be combined with other reasons, but the dis- What would be the other reasons in this case? In this case, I think that the initial encounter with the first brother probably was some kind of a family feud where the two, kind of a Romeo and Juliet situation, but then there was a drug cartel that became involved and it became about, you know, who knows why they were coming after this family, but clearly they were coming after the family. And I think- Let me ask you this. Before we get to the involvement of what you characterize as the drug cartel, if it were a Romeo-Juliet situation, would that be grounds for asylum? Well, only if you could show that the Mexican government was either involved or unable or unwilling to protect. I think that if you can- Would that be true in this case? Absolutely. And I think the myopia I was talking about- Even in the Romeo-Juliet situation? If, well, yeah. I think that if family is a central motive, then under this case, it's an analysis of family-based persecution claims like in Parada most recently or Rios v. Lynch. As long as, you know, in Romeo and Juliet, that's actually a quintessential example of where family really was motivating them. I think the complication is showing why the Mexican government would care about some family feud and not intervene, but here they don't intervene because of the drug cartel. Are you saying there was some Mexican government involvement? Yes. What is the evidence of that? I couldn't find it in myself, but maybe you can help me. Yes. That's actually one of the, I think, largest flaws in the board's reasoning, is that they just failed to even mention the extensive evidence in the record of police involvement in three different ways. First, there was Felipe's repeated statements to his mother and my client, Miss Ibarra, that police were among his abductors and torturers. Then you have her brother, a friend, submitted a declaration and she testified credibly about the fact that he and some of his other brothers were shot at by men in police vans. And you have her brother-in-law, Rogelio, who went back to Mexico and was attacked by men looking for the family, among whom was someone he recognized to be a police officer. So there were three different- Was that individual in uniform? No, Your Honor. I think the issue, though, is whether the board even discusses these facts. That's where I think this case, this court's case law, in Colville Holder, I discussed this on page 38 of my brief, that if there is highly probative or potentially dispositive evidence, the board has to discuss it. And here, they just whiz past the evidence of police involvement. Well, maybe that's because it turns out that the government prosecuted Flores. Right. That is the one thing they say, is that, well, because the police prosecuted on day one of a sequence of events that went on. I have a timeline on pages 684 to 685 of the record that show that was day one of a sequence of events of repeated attacks and assaults on the family that went on for over three months in rapid succession. And we have expert testimony describing why it wasn't inconsistent for the police to intervene that day when it was just a family dispute. But it was after that, when Felipe was abducted and tortured, when the drug cartels are involved, that the police were not only not willing to intervene, but were involved. And there is case law that says that the police might provide some sort of limited assistance or prosecution, but still be involved in persecution. I discussed that in the brief at pages 38 and 39, and actually found an additional Ninth Circuit case, Shofera, from 2000 to 28F3, 1070. That also, the police were actually, the perpetrator was a police officer who was subsequently prosecuted and jailed. But the court found that that was state prosecution. I'd like to reserve the last three minutes for rebuttal. All right. Thank you, counsel. May it please the court. I'm Scott Stewart on behalf of the Acting Attorney General. In this case, the Board of Immigration Appeals upheld the denial of petitioner's asylum application. The board's decision was reasonable and well supported by the record. The record does not compel contrary findings. The petition for review should be denied. I think at the outset, what I'd emphasize, Your Honors, is that this is one of those classic cases where even were there evidence in the record supporting petitioner's version events, there's plenty of evidence to the contrary and plenty of evidence to support the agency's contrary conclusions on each step of the analysis here. Starting with past persecution, the record just does not compel a finding of past persecution in this case. The petitioner herself presented only two items where she herself was potentially directly or somewhat personally targeted, the armed men that appeared at the funeral, again, whom she, as we have explained, did not see. And the four men who came to her sister-in-law's house looking for her, who, by her own words, did not directly threaten her, though she did feel threatened by them arriving. She didn't know the identities. And we don't really have any evidence compelling why they were looking for her or what they were hoping to find. Petitioner herself does seem to concede that those direct efforts by themselves are insufficient and, therefore, moves to the events related to her family. Similarly — Sotomayor, insufficient why? Because they're unfulfilled threats, Your Honor. So they fall within the teaching of this Court's decisions in Lim. Her brother had been killed. Her brother had been killed, Your Honor. But again — Then there was a shooting at the funeral, and somebody came to her and said — came to her home and went looking for her, and said they would look for her until she was under the rocks, whatever that — doesn't sound very good. We didn't get much elucidation on what that meant, Your Honor. I think what this — what this is a case of is there is a suggestion that there is violence of various sorts in Mexico, some drug cartel-related, some kind of general and indiscriminate. The record just — He didn't reason — why — what is the theory that she didn't reasonably fear persecution on the basis of him? The theory is that her — although she genuinely believed what she was testifying to, the evidence just didn't quite get there. She certainly believed that she was threatened, that these risks would happen. But the immigration judge at one point during the proceedings made the observation, look, this is all really speculative. It involves these inferences and assumptions that the police didn't do this or these folks were here for this motive, and the agency just didn't see this as crossing the threshold to satisfy her burden. I think that's what's really going on, Judge Schroeder. It's a bit like some of this — this Court's decision in Wakari is a good example. In that case, the Court acknowledged an opinion, I believe, by Judge Berzont said, look, when you have harm towards somebody's close associates or family members, that can help you make your showing, but you need to have a good, strong, tight connection. They come to her house and say they're going to look for her until she's under the rocks, and they've already killed the brother and made threats at a — at a funeral? I think the — Doesn't quite make it? Your Honor, what I emphasize is that we don't know who the they is in each of those — in all those scenarios, and we don't know that the they is the same person. There is — there is a — you know, particularly given the claim here is supposedly one of — or made to be one of family-related violence, but there's also evidence that supports the idea that Felipe was targeted because he refused to join a — a drug cartel. Other evidence suggests that when people were looking for members of — of the family, they were really looking for the male members. They were — you know, showed up at Petitioner's sister's house and beat Rogelio, her — Petitioner's brother-in-law. Did the — did the I.J. find that — that this was all just random? It didn't do that. I think what I'd say, Your Honor, is I don't think it was dismissed as just pure — pure randomness. I would say that as — as this Court identified in Wachari and in some other cases, the events were just not shown to be connected enough to be able to be properly considered as amounting to bringing things about. What was the time period that took — I can't remember. From the time of the brother's murder to — in the time that they came looking for her. Do you remember? I can't recall. I believe — I believe the murder was in — in May, and I want to say them looking for her was a few months after that, but I — I apologize. I don't know that — that answer, Your Honor. Whatever I'd say, Your Honor, is that this back-and-forth, I do think, helped illustrate the point that the agency contended very carefully with — with the dueling issues here and heard the evidence. It's — as Your Honor knows, it's a very large — large record, and said, look, we just don't think — we just don't think that this makes it. We understand that she reasonably believes this, but it just doesn't quite get to that level of persecution. And given a lot — it was just a gap of proof, as — as we've noted. The four men, we — there wasn't much in the way of the identities of — of the — of the people who were claimed to be the persecutors, and just not much detail, not much direct experience with the petitioner herself. So it just doesn't get to that area where the record would compel a contrary finding, Your Honor. I'd say that goes equally well for the — maybe equally well, if not more so, for the future persecution finding. This was another area where the agency was well within its discretion to — or well within bounds of reasonableness to say, look, this record just doesn't support this finding, especially when three brothers, two sisters, and the petitioner's parents still live in Mexico. My friend has said that the petitioners live in a virtual state of hiding. That is a contention, but not one that — that this record compels and not one that the agency found persuasive. I — I think that's — that's well supported. And then as an alternative ground, I just want to — Was there a finding that they lived openly in the same place? I — they do live, I think, in somewhat different areas, Your Honor. But again, this was — this was one of those — those situations where it was a little bit scanty and — and, look, you know, they saw a van here or a car there or, you know, somebody lived somewhat in the hills. We also know from the record that the family did — although they did live, you know, with neighbors, they were somewhat self-contained for much of the petitioner's life. So we just, again, don't have that compelled conclusion of a state of hiding or that sort of thing. And the agency was — was well within bounds in concluding that. Counsel, would you respond to opposing counsel's view on the participation of the Mexican government? Yes, Your Honor. This is another area where there's just a gap in proof. I mean, a lot is — a lot is said about what — what Felipe said, but many of these things, Judge O'Scanlan, were indirect reports. And what we do know are the following things. Is it Sabino who committed — you know, who, of course, committed the murder, was arrested, convicted and sentenced? He was, of course, the lead — the patriarch of the family that forms the main basis for the — the main claim in this case. We know that the police did take actions. They took reports. They asked for follow-up evidence, that sort of thing. But what about the shooting from the police van that she refers to? I think what the agency reasonably saw in that, Judge O'Scanlan, was that what the record suggested is that the witnesses to these — to these events said, you know, we thought they were police vans, but it's just not compelled that we know that — that police were definitely persecuting. And what we do know is — I guess the evidence of direct police involvement is certainly not compelled, given the kind of lack of weightiness showing direct participation. And I'd add that — Direct participation. You're not saying that the police are not the government? Oh, I'm sorry, Your Honor. I'm saying that there isn't really a — we don't have strong enough evidence in this case that would compel the conclusion that the police were directly involved. I think the bulk of the claim is more of a — or at least a big part of the claim is that the government is unwilling or unable to control. But I just — the record here certainly does not compel that conclusion, either. I mean, the police did what they could. They asked for follow-up information. They asked for Petitioner's mother's phone. She didn't give it. They asked her to wait so that they could come talk to them. They asked for a picture. That was not able to be supplied. When they went and reported Felipe, there's a complaint in the record that the police didn't follow up, but Felipe was soon found, and it was within that area before I believe the 72-hour missing persons mark hit. So the police took reports. The family didn't necessarily follow up, as the police said was needed. And we just don't have one of those situations, Your Honor, where the record compels the conclusion that the police were just going through the motions or didn't care. They, again, prosecuted, convicted, and sentenced, and in prison Sabino. And the record about statements or suppositions or assumptions about police fans and the like just does not make this a situation where the record compels a contrary conclusion on that problem. If there are no further questions, I thank the Court. Thank you, Counsel Rebuttal. Thank you, Your Honors. I want to respond first to the discussion of the events in the funeral and just point out that the reasoning regarding past persecution would necessarily require that these were completely disconnected events. So that not just that these potential other motives for Felipe's abduction and murder were additional motives, but that they were alternative motives, that family was not at all part of the nexus. Because that's the only way that you can discount harm to family members from the cumulative analysis. The cases in Parada or Babala v. Ashcroft say that as long as there is a connection where the threats that Miss Ibarra fears are made more serious by what happened to a family member, then clearly they should be part of the cumulative analysis of her past persecution. So it would require that it was completely random, these various incidents. For example, men approaching her at the funeral was disconnected from the abduction and torture of her brother. And the timeline, as Judge Schroeder was asking about the sequence of events, if you look at the timeline on pages 685 of the record, it begins on May 3rd. And it's a rapid fire sequence of events. Three days later, her second brother is abducted, he's found, he dies May 12th. And you see just this litany of threatening phone calls, direct threats in person, people coming to her door, all repeatedly saying they're going after Los Goños, her family. So I think that the connection between the events is clear. But counsel, what's your response to opposing counsel's observation that there were no acts of persecution directed towards her individually? Well, I think that you can only discount the horrific death of her second brother of torture. I agree that if you were only looking at what she experienced, that would not meet this court's definition of past persecution, because threats need to be accompanied by something to make them really serious. But here, the threats to her were absolutely serious, because she had just lost two brothers to the same people that were coming after her and threatening her. So I think that that's where the connection between the events is so important. On the police involvement, I just want to say that you don't even get to the question of whether reports were taken and whether that was sufficient if you find involvement. That's in Bor-Sedano and Babilavi-Ashcroft, that if the state was the agent, then you don't get to the unable unwillingness prong. That's not necessary once you have actual active state involvement. And I also just wanted to mention about the family members living in Mexico, that one of the biggest areas where the board just failed to deal with the evidence was responding to the fact that she had a sister who went back. This is a rare asylum case where you actually don't have to hypothesize about what's going to happen if she goes back, because her sister did go back and was, again, found not in the same place that her mother is living by the same people looking for her family and subjected to an assault. So … All right. Thank you, counsel. You've exceeded your time. Okay. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case, DiMartini v. DiMartini, has been removed from the calendar. The next case on calendar for argument is Unite Here v. NLRB.
judges: Schroeder, O'scannlain, Rawlinson